IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JUAN GONZALES,

                Petitioner,

       v.

C.A. TERHUNE, Warden,

                Respondent.

NO. C 03-1565 TEH

ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS

I.      INTRODUCTION

     This matter comes before the Court on Petitioner's Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  After carefully considering the parties' written arguments, and the record herein, this Court DENIES petitioner's petition for the reasons discussed below.

II.     BACKGROUND

     A.   Procedural Background

     On April 4, 1999, a Monterey County jury convicted petitioner Juan Manuel Gonzales of second degree murder and attempted murder, with enhancements on both counts for personal discharge of a firearm and commission of an offence in furtherance of a criminal street gang.  On April 5, 2001, the California Court of Appeal affirmed petitioner's judgment in an unpublished opinion.  The California Supreme Court denied review.  The United States Supreme Court denied certiorari on April 15, 2002.  On April 11, 2003, petitioner filed a petition for writ of habeas corpus in this Court, with an application to hold his case in abeyance pending the exhaustion of state remedies for certain claims.  The Court granted the application.  On August 20, 2003, petitioner filed a state petition for writ of habeas corpus in the California Supreme Court.  The state petition was summarily denied on May 12, 2004.

United States District Court
For the Northern District of California

On June 1, 2004, petitioner filed the amended petition presently before the Court.  He contends that his conviction should be set aside as unconstitutional on the grounds that (1) there is insufficient evidence to support his conviction, (2) the trial court erred in instructing the jury, and (3) the prosecution improperly suppressed evidence under *Brady*.

B.   Factual Background

1.   The Shooting

On August 9, 1998, at about 10:30 p.m., Hugo Ochoa ("Ochoa") and Samsun Lara ("Lara") were riding Lara's bike down a residential street in Salinas, California.  Ochoa was pedaling the bike while Lara rode on the handlebars. As the pair rode down Rider Street, a red Chevrolet pickup truck drove past them traveling in the same direction.  The truck had tinted windows and a distinctive chrome "Chevrolet" emblem on its tailgate.  As they turned down Antigua Street, they were approached by two males who asked Ochoa "Where you from?" Reporter's Transcript (hereafter "RT") 165-66.  It was understood that this question was actually an inquiry into Ochoa and Lara's gang affiliation.  Ochoa responded "[N]othing."  RT 166.  The man uttered something Ochoa did not understand.  Suddenly, both men drew their guns and opened fire, hitting Ochoa and Lara multiple times.  Lara died at the scene and Ochoa survived. Ochoa heard the men walk back across the street and saw the red Chevrolet he had seen earlier drive past him.

2.   The Police Investigation and Arrest of Petitioner

Salinas Police Officer Steven Card ("Card") was one of the first police officers to respond to the shooting.  Shortly after arriving, he interviewed two witnesses at the scene. The witnesses wished to remain anonymous, so Card identified them in his report as "Witness #1" and "Witness #2."  Both witnesses reported seeing a red Chevrolet truck moments after the shooting.  Witness #1 was unable to observe who was driving the vehicle. Witness #2 said s/he believed s/he had seen long hair on the driver and was left with the impression that the driver was female, though s/he could not be positive.

1    At approximately 10:51 p.m., police issued a dispatch regarding the red Chevrolet

2  truck based upon the description provided by Witness #2.  Just before 11:00 p.m., Salinas

3  Police Officer Napoleon Arsitio spotted a red Chevrolet pickup matching the description.

4  The pickup pulled to the curb in front of a house, let out a passenger, and continued down the

5  street.  Officer Arsitio briefly followed, and then signaled for the truck to stop.  The driver of

6  the truck was Juan Gonzales, the petitioner.  He was alone.

7    The police immediately secured petitioner's residence, eight-tenths of a mile from the

8  shooting, while they sought a search warrant.  The other residents of house, petitioner's

9  mother, two sisters, and step-father, were all at home.  Shortly after the house was secured

10  petitioner's mother fell ill with the flu and was taken to the hospital by petitioner's sister,

11  Elizabeth.  Elizabeth later returned to the house and asked the police if she could take her

12  laundry basket back to the hospital with her so she could do the laundry while waiting for her

13  mother.  When the officers told her they needed to search the basket before she left, she tried

14  to convince them that no search was necessary.  A tug of war then ensued for control of the

15  basket. Elizabeth then left, saying that if the Officer was going to make "such a big deal"

16  about it that she would just leave the basket behind.  RT 193.  Later, after obtaining the

17  search warrant, police found three handguns at the bottom of the basket: a loaded High Point

18  .45-caliber semiautomatic pistol, an unloaded Colt .45-caliber semiautomatic handgun, and a

19  loaded Jennings .380-caliber semiautomatic handgun.  Ballistic tests revealed that the Colt

20  .45 and the Jennings .380 were consistent with shell casing found at the scene of the murder.

21  Petitioner's fingerprints were not found on either of these guns.  The police also administered

22  a gunshot residue test on petitioner's hands shortly after his arrest.  The test was negative.

23    Under the mattress of petitioner's bed, police found a loaded Intratec Tec 9-millimeter

24  semiautomatic pistol.  Police found additional 9-millimeter ammunition in a sock in

25  petitioner's dresser drawer.  The police also found considerable indicia confirming

26  petitioner's membership in East Las Casitas, or "ELC," a local Norteno criminal street gang.

27  Ochoa and Lara were riding through ELC territory when they were shot.

28

3

During the search, Petitioner waived his right to silence and spoke with a police investigator. Petitioner told the investigator that on the evening of the shooting he had gone for a drive in the truck. According to petitioner, as he was driving, he saw "George," an acquaintance, walking, and offered him a ride. George got into the truck, pulled a beer out of his pocket, and opened it. Petitioner then saw Officer Arsitio behind him. Troubled at the prospect of receiving a ticket for having an open container in his car, petitioner told George to get out of the truck. George complied. Petitioner was stopped shortly thereafter by Officer Arsitio.

At this time, petitioner denied any involvement in or knowledge of the shooting. He denied that he was a current ELC gang member. He similarly denied knowledge of the guns found in his house, including the one found beneath the mattress of his own bed. Petitioner suggested that the police had planted the guns. Petitioner was arrested and charged with the murder of Samsun Lara and the attempted murder of Hugo Ochoa.

### 3.   Events Prior to Trial

Two days after the shooting, petitioner's mother told police that she had spoken to petitioner about his role in the shootings. The police told her that it would make a "big difference" if petitioner was simply the driver of the truck as opposed to one of the gunmen. Petitioner's mother stated that her son had told her that he was "just driving" the truck and that he was not one of the two gunmen. Ex. B at 27.

While petitioner was in jail awaiting trial, he was visited by Jamie Vega ("Vega"). Petitioner was assigned a specific visiting room for the visit. He began speaking to Vega through a phone line which was being tape-recorded. Minutes later petitioner switched to a different phone. Assuming his conversation was no longer being monitored, petitioner asked Vega to tell petitioner's own investigator and attorney that petitioner was at Vega's house at the time of the shooting. Vega agreed to do so. The two also discussed at which address – Vega's mother's or mother-in-law's – they would claim that they were at.

United States District Court

For the Northern District of California

Steven Rease ("Rease") represented petitioner at trial.  Prior to trial, Rease received a copy of Officer Card's August 10, 1998 police report, which contained the statements of "Witness 1" and "Witness 2."  The report did not, however, contain the actual names and address of these witnesses.  Rease wrote the Monterey County District Attorney's office on November 17, 1988, requesting the names of the two witnesses "who identify Gonzalez"s [sic] truck as the truck they saw near the scene of the shooting."  Ex. C (Letter of November 17, 1998).

On January 11, 1999, Deputy District Attorney Charles Olvis wrote defense counsel that "[t]he individuals who say they saw the red truck" were "Tera Peguero" and "Patricia Magpausau."  Rease Decl. ¶ 6; Ex. D (Memorandum of January 11, 1999).  Based on this information, Rease believed that Ms. Peguero and Ms. Magpausau were the two confidential informants – Witness 1 and Witness 2 – to whom Officer Card had referred in his August 10, 1998 report.  Rease Decl. ¶ 8.  Olvis further informed defense counsel that Ms. Magpausau did not wish to speak to the defense.  Attached to his memorandum was a copy of Monterey County Police Officer Gerard Ross's January 6, 1999 Report (Ex. E).  In the report, Officer Ross stated that he had contacted the same individual identified by Officer Card as Witness 1 at her residence, and that she was reluctant to speak with the police.

Taking Officer Ross's report and Olvis's memorandum at face value, Rease believed that the individual identified as Witness 1 in Officer Card's report was Ms. Magpausau.  Rease Decl. ¶ 11.  Because Rease believed that Witness 1 was Ms. Magpausau, by process of elimination, Rease further believed that Ms. Peguero was Witness 2, the witness who had seen long hair on the driver and was left with the impression that the driver was female.

Rease subsequently interviewed Ms. Magpausau and Ms. Peguero and asked them whether they had seen a long-haired driver.  Neither had.  Ms. Peguero told Rease that she could not even see the back of the driver's head.  Ex. F at 13 (Tara Peguero Interview).  Similarly, Ms. Magpausau told Rease that she could neither see nor describe anybody in the truck.  Ex. G at 7 (Magpausau Interview).

4.       The Trial

The state charged petitioner with murder and attempted murder.  In light of the negative gunshot residue test, however, and the fact that petitioner's fingerprints were not found on any of the guns, the state did **not** argue that petitioner was one of the shooters.  Instead, the state's theory was that three people had committed the crimes: two unknown individuals shot Ochoa and Lara while petitioner stayed inside the truck.[1]  Under California's aider and abettor law, the state theorized, Mr. Gonzales was liable for murder and attempted murder because he had driven the truck knowing the crimes were going to occur.

a.       Testimony at Trial

Petitioner testified on his own behalf at trial.  His defense was that he had not been directly involved in the shooting, and had instead unwittingly lent his truck to the shooters and held their guns for them.  Petitioner refused to identify the individuals he claimed to be the actual perpetrators of the crime.  He  admitted that he had lied to the police on the night of the shootings.  Petitioner also admitted that he solicited Vega to concoct an alibi for him.

According to petitioner, after leaving work the day of the shooting, he went to a birthday party at a co-worker's house and then returned home.  He was lying on his bed watching television when he heard a tap on his window.  He looked outside and saw a man he recognized as a fellow ELC gang member.  This unidentified male motioned him to the front door of the house where another unidentified man, who petitioner also knew to be an ELC gang member, were waiting for him.[2]  The two men asked to borrow petitioner's truck to buy beer and petitioner gave them the keys.  They left, and petitioner went back inside the house.  A few minutes later, petitioner heard gunshots.

---

[1]After the shooting, Ochoa viewed a six-photo lineup and identified petitioner and another individual as the shooters.  Ochoa was not positive, however, and his testimony conflicts with the results of the gun powder residue test, which came back negative.

[2]As indicated *ante*, petitioner refused to identify the two males he alleged to be the true shooters.

United States District Court

For the Northern District of California

1    The two males returned in petitioner's truck.  They handed petitioner the three guns

2   that were later found in the house, and told him to hold them, and that they would pick them

3   up the next day.  Petitioner took the guns, wrapped them in a towel, and hid them in his sister

4   Elizabeth's room in her laundry basket.  RT 548-49, 585-87.  According to petitioner, he did

5   *not* tell Elizabeth that the guns were in the basket.  RT 587-88.  Petitioner then agreed to

6   give the two men a ride home in petitioner's truck.  After dropping one man off, petitioner's

7   remaining passenger noticed that a police car – Officer Arsitio – was behind them.  The

8   passenger told the petitioner, "You know what, just let me off right here.'"  RT 550-51.

9   Officer Arsitio stopped petitioner shortly thereafter.

10    Petitioner testified that he kept the guns and agreed to give the two unidentified gang

11   members a ride home in his truck, even though he knew they were involved in a shooting,

12   because gang code dictated that he do what the other members asked of him.  RT 547.

13   Petitioner also testified that he knew people who were killed for testifying against gang

14   members.  The State's expert also testified that gang members may use the home of a non-

15   probationer (such as Mr. Gonzales) as a "safe house" to protect weapons from probation

16   searches.

17    Both Ms. Peguero and Ms. Magpausau testified – as "Jane Does" – at trial.  Their

18   testimony accorded with their earlier interviews with Rease; neither could see nor describe

19   anyone in the truck.  RT 26, 33.  According to Ms. Peguero's testimony she (1) had been

20   inside her home located at the crime scene prior to the shooting, (2) was at the crime scene at

21   the moment the shooting occurred, and (3) observed a red truck leave the scene after the

22   shooting.  According to Ms. Magpausau's testimony, she (1) was in her home situated at the

23   crime scene when the shooting occurred, (2) heard gunshots, then saw a red truck with the

24   headlights blacked out, and (3) later identified Mr. Gonzales's truck as the red truck she saw

25   at the scene of the shooting.

26    Petitioner's mother testified at trial.  She testified that she did not recall her

27   conversation with the police in which told them that petitioner had told her he was driving

28   the truck at the time of the shootings.  She asserted that virtually all of the statements she

7

1  made to police were false, explaining that, at the time she made them, she was "still sick" and

2  "under medication."

3                             b.      Jury Verdict

4        On April 4, 1999, the jury returned a verdict of guilty.  Petitioner was sentenced to 67

5  years to life in prison.

6

7             5.      Events After Trial

8        Several months after petitioner was convicted, the state charged petitioner's sister

9  Elizabeth with being an accessory after the fact to the shooting.  During a pre-trial motion in

10  that case, the prosecutor told the court that "there is actually one witness that says they a saw

11  another person, a female in the car."  Reporter's Transcript of Proceedings in re Elizabeth G.,

12  S096998 (hereinafter "RT II") at 1-2.

13       Thereafter, petitioner retained a private investigator who contacted Ms. Peguero and

14  Ms. Magpausau.  While Ms. Peguero indicated that she was not the confidential informant

15  identified in the report as Witness 2, she was unwilling to sign a declaration.  Nor was Ms.

16  Magpausau willing to cooperate.  Accordingly, in his First Amended Petition, petitioner

17  requested that this Court order respondent to disclose the actual identity of Witness 2.

18  Respondent subsequently revealed that the confidential informant referred to in Officer

19  Card's report as Witness 2 is Greg Sakasegawa, a security guard who was working in the

20  area of the shooting.  Memorandum of Points and Authorities in Support of Answer

21  (hereinafter "Answer") at 13.  Petitioner was able to locate Mr. Sakasegawa who confirmed

22  that he was Witness 2, and that he was in the neighborhood at the time of the shooting and

23  saw a suspicious red truck.  He believed that the driver of the truck was female because the

24  driver had long hair although he could not be positive, and would have testified if called as a

25  witness in petitioner's trial.  Although he gave Officer Card his contact information, Mr.

26  Sakasegawa was never contacted again by the police or the district attorney's office.

27

28  III.    STANDARD OF REVIEW

8

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district

2    court may grant a petition challenging a state conviction or sentence on the basis of a claim

3    that was "adjudicated on the merits" in state court only if the state court's adjudication of the

4    claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

5    application of, clearly established Federal law, as determined by the Supreme Court of the

6    United States; or (2) resulted in a decision that was based on an unreasonable determination

7    of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.

8    § 2254(d).

9    Challenges to legal questions resolved by the state court are reviewed under §

10   2254(d)(1); the question on review is (a) whether the state court's decision contradicts a

11   holding of the Supreme Court or reaches a different result on a set of facts materially

12   indistinguishable from those at issue in a decision of the Supreme Court; or (b) whether the

13   state court, after identifying the correct governing Supreme Court holding, then unreasonably

14   applied that principle to the facts of the prisoner's case. Lambert v. Blodgett, 393 F.3d 943,

15   978 (9th Cir. 2004).

16   A.   Adjudicated on the Merits

17   A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for

18   purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on

19   the basis of the substance of the constitutional claim advanced, rather than denying the claim

20   on the basis of a procedural or other rule precluding state court review on the merits.

21   Lambert, 393 F.3d at 969.  The Ninth Circuit interprets the California Supreme Court's

22   summary denial of state habeas review without citation of authority to be a decision on the

23   merits.  Gantt v. Roe, 389 F.3d 908, 913 n. 7 (9th Cir. 2004);  Harris v. Superior Court, 500

24   F.2d 1124, 1127-29 (9th Cir. 1974).

25   B.   Clearly Established Supreme Court Law

26   "Clearly established federal law, as determined by the Supreme Court of the United

27   States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as

28   of the time of the relevant state-court decision." Williams (Terry) v. Taylor, 529 U.S. 362,

412 (2000). While a state court decision may not be overturned on habeas review simply because of a conflict with circuit-based law, circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003).

      C.     Unreasonable Application

     "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13. A district court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 124 S. Ct. 2140, 2149 (2004).

     The standard of review under AEDPA is somewhat different where the state supreme court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002); Bailey v. Newland, 263 F.3d 1022, 1028 (9th Cir. 2001); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982 ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling

10

United States District Court

For the Northern District of California

federal law. Only by that examination may we determine whether the state court's decision was objectively reasonable.")(citation omitted)); accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).  Thus, while "a state court's decision on the merits concerning a question of law is, and should be, afforded respect . . . if there is no such decision . . . there is nothing to which to defer."  Greene, 288 F.3d at 1089.  In sum, while a district court is not required to defer to a state court's decision when that decision provides nothing to defer to, the district court  ". . . must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law."  Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001) overruled in part on other grounds by Payton v. Woodford, 346 F.3d 1204 (9th Cir. 2003).

IV.    DISCUSSION

As noted above, Petitioner contends that he is entitled to relief because (1) there was insufficient evidence to support his conviction, (2) the trial court improperly instructed the jury, and (3) the prosecution improperly suppressed evidence under *Brady*.  Each of these claims is discussed in turn.

A.    Sufficiency of the Evidence Claim

The state charged petitioner with murder and attempted murder on a theory that petitioner aided and abetted the actual shooters. Petitioner contends his conviction violates due process because there was insufficient evidence that he aided and abetted the shooters *prior* to the shootings.

United States District Court

For the Northern District of California

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A federal court reviewing collaterally, however, does *not* determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335,338 (9th Cir. 1992).  Rather, only if *no* rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. Jackson v. Virginia, 443 U.S. 307, 324 (1979).  If confronted by a record that supports conflicting inferences, a jury's credibility determinations are entitled to near total deference: a court "must presume -- even if it does not affirmatively appear on the record, that the trier of facts resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326; Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Furthermore, circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

Under the AEDPA, a district court applies the above standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  The court must ask whether the operative state court decision reflected an "unreasonable application" of Jackson and Winship to the facts of the case.  Id. at 1275 (quoting 28 U.S.C. § 2254(d)).

To establish that petitioner was an aider and abettor under California law, the state was required to show that he (1) knew the unlawful purpose of the shooters; (2) had the intent or purpose of committing or encouraging or facilitating the commission of the crimes; and (3) by act or advice aided, promoted or encouraged or instigated the commission of the crime.  People v. Beeman, 35 Cal.3d 547, 560 (1984).

As petitioner concedes, there is more than sufficient evidence in the record to show that Lara and Ochoa were shot by two men who got out of a red Chevrolet truck.   Petitioner contends, however, that there was not sufficient evidence to show (1) he drove the truck at the time of the shooting and (2) he did so with "knowledge of the unlawful purpose of the

United States District Court
For the Northern District of California

1   perpetrator, and . . . the intent or purpose of committing, encouraging, or facilitating the

2   commission of the offense." Id.

3       Bearing in mind the stringent standard required in assessing a sufficiency of evidence

4   claim, the Court finds that the California Court of Appeals' determination, that there was

5   sufficient evidence to support Petitioner's conviction, did not reflect an "unreasonable

6   application" of Jackson to the facts of the case. Juan H. at 1275. As the appellate court

7   noted, the state presented a wealth of circumstantial evidence tying petitioner to the crime.

8   At the time of the shooting, a neighbor heard a sound of a vehicle and heard shots being

9   fired. The neighbor looked out of a window and saw a vehicle she latter identified as being

10  petitioner's truck. Petitioner was stopped shortly after the shooting driving the truck and the

11  guns used in the shooting were found in his house.

12      There was also evidence from which the jury could infer consciousness of guilt. For

13  example, there was evidence that petitioner repeatedly lied to the police when questioned

14  about his involvement in the shootings and attempted to enlist a fellow gang member to help

15  concoct an alibi. While Petitioner presented a version of events that comported with the

16  theory of the defense at trial, his prior inconsistent statements could easily have warranted

17  the total disregard of this testimony by the jury. Further, two days after the shooting, the

18  petitioner's mother told the police that she had spoken with him about his role in the

19  shootings and he told her that he was the driver. At trial, she claimed that she did not recall

20  making such statements to the police. However, a reasonable juror may have found her

21  inability to remember this damaging statement to have been entirely too convenient and

22  given correspondingly greater weight to her earlier out of court statement to the police

23  officers.

24      Petitioner cites Mitchell v. Prunty, 107 F.3d 1337, 1342 (1997), overruled on other

25  grounds in Santamaria v. Horsley, 133 F.3d 1242 (9th Cir. 1998), for the proposition that

26  "membership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid,

27  promotion, encouragement or instigation needed to establish aiding and abetting." The

28  California Court of Appeals distinguished Mitchell by noting that it was a case in which the

13

*only* evidence of aiding and abetting the state offered was the defendant's gang membership. See Mitchell at 1342.

Granted, simple membership in a gang that is involved in a homicide is an insufficient basis from which to infer a particular gang member's intent, and it would be constitutionally troubling if petitioner was convicted solely based on the fact that he was an ELC gang member.  Here, however, the record contains ample circumstantial evidence to support a conclusion that petitioner aided and abetted the shooters prior to the shooting.

Viewing this circumstantial evidence in its totality, the Court cannot definitively say that no rational trier of fact could have found beyond a reasonable doubt that petitioner aided and abetted the shooters *before* the shootings.  See Payne, at 338 ("Jackson allows us to determine only whether any rational trier of fact could have found intent beyond a reasonable doubt, not whether we would.").  Accordingly, the California Court of Appeal's similar determination was not an "unreasonable application" of Jackson.

B.    Jury Instructions.

In a separate claim, Petitioner contends that his rights to due process and to a jury trial were violated due to instructional error.  Specifically, petitioner contends that his constitutional rights were violated because the trial court (1) did not instruct the jury that it could not convict petitioner as an aider and abettor if he aided the shooters only after the shooting had occurred and (2) declined to instruct the jury on the offense of accessory after the fact.

1.    Instructional Error.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Id.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  Id.

United States District Court

For the Northern District of California

1   Petitioner contends that his constitutional rights were violated because the trial court

2   insufficiently instructed the jury on aiding and abetting theory. The trial court instructed the

3   jury pursuant to CALJIC [No.] 3.01:

> A person aids and abets the commission or attempted commission
> of a crime when he or she: (1) with knowledge of the unlawful
> purpose of the perpetrator, and (2) with the intent or purpose of
> committing or encouraging or facilitating the commission of the
> crime, and (3) by act or advice aids, promotes, encourages or
> instigates the commission of the crime.[3] A person who aids and
> abets the commission or attempted commission of a crime need not
> be present at the scene of the crime. Mere presence at the scene of
> a crime which does not itself assist the commission of the crime
> does not amount to aiding and abetting. Mere knowledge that a
> crime is being committed and the failure to prevent it does not
> amount to aiding and abetting.

11   Petitioner neither objected to the use of this instruction nor requested further

12  instruction on accomplice liability. Petitioner now contends, however, that CALJIC 3.01

13  was constitutionally deficient in that it fails to expressly tell the jury it may not find

14  petitioner vicariously liable unless his acts in aiding and abetting occurred *before* the

15  shootings.[4]

16   The question before this Court is whether the appellate court's decision that the

17  challenged instruction was unambiguous was an objectively unreasonable application of

18  clearly established federal law. This Court concludes that it was not.

19   As noted above, petitioner's claim of instructional error must be evaluated "in the

20  context of the instructions as a whole," not in artificial isolation. Estelle at 72. Here, in

21  addition to the instruction on aiding and abetting, the trial court instructed the jury that in

22  each of the charged crimes of murder "there must exist a union or joint operation of act or

23  conduct and a certain specific intent in the mind of the perpetrator and unless such specific

---

[3]This portion of the instruction mirrors language approved by the California Supreme
Court in People v. Beeman, 35 Cal. 3d 547, 561 (1984).

[4]Under California law, if a defendant's liability for an offense is predicated upon the
theory that he or she aided and abetted the perpetrator, then the defendant's intent to
encourage or facilitate the actions of the perpetrator "must be formed *prior to or during*
'commission' of that offense." People v. Montoya, 7 Cal. 4th 1027, 1039 (1994) (italics in
original).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    intent exists the crime to which it relates is not committed." CALJIC [No.] 3.31.  The court

2    also instructed that the intent necessary for murder was "malice aforethought" CALJIC [No.]

3    8.10 that "aforethought" meant that "the required mental state must precede rather than

4    follow the act."  CALJIC [No.] 8.11.  Relying on People v. Williams, 16 Cal. 4th 635 (1997),

5    the appellate court held that these instructions, when considered together, were sufficiently

6    explicit to adequately inform the jury that an aider and abettor who shares the actual

7    perpetrator's intent to kill must have formed that intent prior to or concurrent with the

8    criminal act.

9         Petitioner nonetheless argues that the timing of Mr. Gonzales's criminal act is a

10   necessary element of the offense which must be proven beyond a reasonable doubt to a jury.

11   If a jury instruction omits a necessary element of a crime, constitutional error has occurred.

12   See Ho v. Carey, 332 F.3d 587, 592 (9th Cir. 2003) (finding jury instructions "erroneous"

13   rather that ambiguous where they included an uncorrected general instruction that second-

14   degree murder could be based on a finding of general intent).  The Court is not convinced,

15   however, that CALJIC 3.01 omits a necessary element of aider and abettor liability or states a

16   theory of culpability that does not exist under California law.  See People v. Booth, 48 Cal.

17   App. 4th 1247, 1256 (1999) (CALJIC 3.01 adequately defines aider and abettor liability

18   under California law).  Though it does not explicitly state that a defendant may not be

19   vicariously liable for crimes committed by others prior to his involvement, such a proposition

20   is *implicit* throughout the instruction.  For example, the instruction requires the prosecutor to

21   prove beyond a reasonable doubt that the accused had "knowledge of the unlawful *purpose*

22   of the perpetrator."  CALJIC 3.01 (emphasis supplied).  In ordinary language, purpose is

23   defined as "an intended or desired result."  The Random House New Collegiate Dictionary

24   1074 (Rev. Ed.1980); see also United States v. Tirouda, 394 F.3d 683, 689 (9th Cir. 2005)

25   (whether a term in a jury instruction requires definition depends on whether the term

26   expresses a concept within the jury's ordinary experience).  It is clear then, by the plain

27   language of the instruction, that the knowledge element must proceed the criminal act for

28   aider and abettor liability to ensue.

United States District Court

For the Northern District of California

Even assuming *arguendo*, however, that the instruction is ambiguous with respect to the timing element, petitioner's claim fails.  In reviewing an ambiguous instruction the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather the court must determine whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the constitution.  See Estelle v. McGuire, 502 U.S. at 72 & n. 4.

In determining whether the jury was reasonably likely to misapply the instruction, the court may consider the arguments counsel made to the jury in it's closing statement.  Middleton v. McNeil, 541 U.S. 433, 438 (U.S. 2004).  In closing argument, the state argued petitioner's guilt on the theory that he was the driver and companion of the shooters.  The state never argued that petitioner could be liable as an aider and abetter if he was at home during the shootings.  In fact, the state urged the jury to find petitioner vicariously guilty of personally discharging a firearm, a sentencing enhancement, because "he was a driver."  RT 644-45; 673.  Conversely, petitioner argued his version of events: that he had been at home during the shooting, and that, as far has he knew, the shooters had simply borrowed his truck to purchase beer.

As such, the jury was presented with two competing theories: either petitioner was at the scene of the crime as a driver (the state's theory) or petitioner was at home during the time of the shooting and only learned of it after the fact (petitioner's theory).  Essentially, petitioner argues that, due to allegedly ambiguous instructions, the jury could have accepted the defense theory of the crime yet still returned a verdict for the prosecution because the instruction was ambiguous.

There is not a reasonable likelihood, however, that this is what actually happened. It appears that the jury accepted the state's theory of the case (that petitioner was at the scene of the crime as a driver) as this was the only theory of liability argued with respect to the

17

United States District Court

For the Northern District of California

sentencing enhancements, which the jury found to be true.[5]  The jury was charged with CALJIC 3.01 which clearly states that "[m]ere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting" and "[m]ere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."  It is highly unlikely that the jury interpreted these instructions to allow for a finding of guilt if they believed that petitioner's intention to facilitate the actions of his confederates was not formed until after the shooting.

In short, even if CALJIC 3.01 was found to be an ambiguous instruction, there is not a "reasonable likelihood" that the jury *in this case* applied the instruction in a way that "so infected the entire trial that the resulting conviction violates due process."  Estelle at 72.  As such, the California Court of Appeal's decision that petitioner's constitutional rights were not violated by instructional error was not an unreasonable application of Supreme Court precedent.[6]

2.    Refusal to Give Instruction

In a related claim, petitioner contends that the trial court's failure to instruct on the petitioner's theory of the case violated his federal and constitutional rights.[7]  A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings.  See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).

---

[5]The jury originally returned from its deliberations with a question regarding vicarious liability on the sentencing enhancement: "RE PC 12022.53(e) discharge of a firearm.  If Gonzalez did not pull the trigger, but was a principal in the crime, does that make him guilty of the above law?"  The trial court reread an instruction which stated that the term "personally" included either petitioner firing the firearm or another principal firing it.  Almost immediately thereafter, the jury returned its verdicts of guilty of second degree murder and non-premeditated attempted murder, with true findings on both personal use firearm enhancements.

[6]While the appellate court did not cite Supreme Court authority in its decision, the Supreme Court has made it clear that neither citation nor even awareness of relevant Supreme Court precedent is required as long as the reasoning and result of the state-court decision does not involve an unreasonable or contradictory application of that precedent.  Early v. Packer, 537 U.S. 3, 7 (2002); Powell v .Galaza, 328 F.3d 558, 562-63 (9th Cir. 2003) (accord) (on remand from United States Supreme Court).

[7]This was the question upon which petitioner sought and was denied certiorari on direct review.  Gonzalez v. California, 535 U.S. 991 (2002).

18

United States District Court

For the Northern District of California

1    The error must so infect the trial that the defendant was deprived of the fair trial guaranteed

2    by the Fourteenth Amendment.  See id.  The omission of an instruction is less likely to be

3    prejudicial than a misstatement of the law.  See Walker v. Endell, 850 F.2d at 475-76 (citing

4    Henderson v. Kibbe, 431 U.S. at 155).  Thus, a habeas petitioner whose claim involves a

5    failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v.

6    Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155

7    (1977)).

8         As noted, the state's theory was that petitioner was guilty as an aider and abettor

9    because he aided the shooters before or during the commission of the crime.  In contrast the

10   defense theory was that petitioner was guilty as an accessory after the fact, as he provided aid

11   to the shooter after the crime occurred.  During trial, petitioner requested an accessory after

12   the fact instruction to present the defense theory to the jury.  The trial court refused to do so.

13   Petitioner contends that this refusal to instruct the jury on petitioner's theory of the case

14   deprived him of his 14th Amendment right to a fair trial.

15        In denying petitioner's request, the trial court relied on People v. Birks, 19 Cal.4th

16   108, 136 (1998).  In Birks, the California Supreme Court held that the California Constitution

17   does not "grant criminal defendants an affirmative right to insist on jury consideration of

18   nonincluded offenses without the prosecutor's consent."  Id.  The California Supreme

19   Court's ruling was grounded in separation of powers concerns: prosecuting authorities,

20   exercising executive functions, ordinarily have the sole discretion to determine whom to

21   charge with public offenses and what charges to bring.  Id.  Holding that a court, upon the

22   defendant's demand and without the prosecution's consent, may allow the jury to consider

23   crimes neither charged nor necessarily included in the charge violates these principles.  Id.

24   In effect, it provides the defendant with "the power to determine what crime he is charged

25   with, a power that resides exclusively with the prosecution."  Id. (emphasis in original).[8]

26

27        [8]The California Supreme Court found that lesser necessarily included offenses did not
     present a similar problem, because "the prosecution understands that when it chooses to
     charge the greater offense, it is by definition charging the elements of every lesser offense
28   necessarily included."  Bricks at 134 n. 18.

United States District Court

For the Northern District of California

In an attempt to avoid <u>Birks</u>, petitioner argues that he had a federal constitutional right to accessory instructions.[9]  Petitioner relies on <u>Conde v. Henry</u>, 198 F.3d 734 (9th Cir. 1999), in which a noncapital defendant was charged with kidnaping for purposes of robbery.  <u>Id.</u> at 739.  The defendant had two "inconsistent theories of the case: first, that he  was innocent of all charges; second, that he was guilty of kidnaping for the purposes of burglary but not for robbery."  <u>Id.</u>  As such, he requested a jury instruction on simple kidnaping, arguing that it was his "theory of defense."  <u>Id.</u>  The trial court rejected his request, and the Ninth Circuit reversed, holding that "it is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case" and that it was error to deny defendant's request for an instruction on simple kidnaping where such instruction was supported by the evidence.  <u>Id.</u>;  but <u>cf.</u> <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000) (the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim).

While <u>Conde</u> supports petitioner, <u>Conde</u> was evaluated under the less stringent pre-AEDPA standards.  <u>Id.</u> at 738 ("AEDPA's restrictions do not apply because the original petition was filed before the effective date of AEDPA").  As such, <u>Conde</u>  did not address whether the state court's contrary determination involved an "unreasonable application of clearly established federal law, *as determined by the Supreme Court of the United States*."  28 § 2254(d)(1)(emphasis added).  The constitutional authority petitioner cites may be "clearly established" federal law in this circuit, but circuit authority alone does not support a federal court's grant of the writ under 28 U.S.C. 2254(d)(1). <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir.), <u>cert. denied</u>, 540 U.S. 968 (2003).  Only "clearly established" Supreme Court authority will do.  <u>Id.</u>

Unfortunately for petitioner, such "clearly established" Supreme Court authority is absent.  See <u>Keeble v. United States</u>, 412 U.S. 205, 213 (1973) (The Supreme Court has "never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the

1    right of a defendant to have the jury instructed on a lesser included offense").  This absence

2    of Supreme Court precedent is relevant to deciding whether the state court's adjudication was

3    objectively reasonable.  Lam v. Kelchner, 304 F.3d 256, 268-69 (3d Cir. 2002).  The

4    Supreme Court has emphasized that "[a] federal court may not overrule a state court for

5    simply holding a view different from its own, when the precedent from the Supreme Court is,

6    at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003) (per curiam).  Thus,

7    "[a]lthough lower federal court and state court precedent may be relevant when that

8    precedent illuminates the application of clearly established federal law by the United States

9    Supreme Court, if it does not do so, *it is of no moment*."  Casey v. Moore, 386 F.3d 896, 907

10   (9th Cir. 2004) (emphasis added).

11        Given the above, and the difference of opinion between the California and the Ninth

12   Circuit courts, this Court is not persuaded that the state court unreasonably applied clearly

13   established Supreme Court law by refusing to instruct the jury on accessory after the fact

14   liability.  See Boyd v. Newland, 393 F.3d 1008, 1017 (9th Cir. 2004) (the state court's ruling

15   was not unreasonable, even though it conflicted with a Ninth Circuit decision, in the face of

16   other circuit authority directly contrary to the Ninth Circuit decision, and in the absence of

17   explicit direction from the Supreme Court); Bailey v. Newland, 263 F.3d 1022, 1032 (9th

18   Cir. 2001); see also Vieux v. Pepe, 184 F.3d 59, 66 (1st Cir. 1999) (state court decision was

19   not unreasonable where there was a split of authority on the issue, both of which were

20   supportable).

21        C.    Brady Violation

22        Finally, petitioner contends the state suppressed material exculpatory evidence in

23   violation of Brady v. Maryland, 373 U.S. 83 (1963).  Specifically, petitioner contends that

24   the state's failure to disclose the actual identity of confidential Witness 2 before or during

25   trial violated his due process right to a fair trial.  Before examining the merits of petitioner's

26   Brady claim, however, the Court must determine whether the claim is timely under

27   AEDPA's one-year statute of limitations, given that the Brady claim was first filed in an

28   amended petition after the statute of limitations had run.

1       1.      Timeliness of Petitioner's Brady Claim

2           Petitioner was convicted of the current charges on April 4, 1999, and was sentenced to

3   67 years to life.  On April 5, 2001, the California Court of Appeal affirmed petitioner's

4   judgment in an unpublished opinion.  The California Supreme Court denied review.  The

5   United States Supreme Court denied certiorari on April 15, 2002.  The state court judgment

6   became final on that date, which started the clock running on AEDPA's one-year statute of

7   limitations.  Wixom v. Washington, 264 F.3d 894, 897 (9th Cir. 2001).

8           Petitioner filed his Petition for Writ of Habeas Corpus with this Court on April 11,

9   2003, with four days to spare before the expiration of the statute of limitations.  At the same

10  time, petitioner filed an application to hold his federal petition in abeyance while he litigated

11  unexhausted claims in state court.  These claims could not have been brought in the original

12  habeas petition without making it a "mixed petition" subject to dismissal.  Rose v. Lundy,

13  455 U.S. 509 (1982).

14          On June 16, 2003, this Court granted the abeyance application and ordered petitioner

15  to file a status report every six months, beginning on December 1, 2003.  In  doing so, the

16  Court primarily relied on Calderon v. District Court (Taylor), 134 F.3d 981, 988 (9th Cir.

17  1998).  In that case, petitioner filed a "mixed" petition for writ of habeas corpus in the district

18  court containing both exhausted and unexhausted claims.  The state sought to have the

19  petition dismissed.  Instead the district court adopted a three-step procedure: the court (1)

20  allowed the petitioner to amend  his petition to remove the exhausted claims; (2) held in

21  abeyance the amended, fully exhausted petition to allow the petitioner the opportunity to

22  proceed to state court to exhaust the deleted claims; and then (3) permitted the petitioner to

23  reinsert the newly exhausted claims back into the original petition.  Id.; see also Jackson v.

24  Roe, No. 02-56210, 2005 U.S. App. LEXIS 20632 at *9 (9th Cir. September 23, 2005).

25          In this case, petitioner followed a slightly different procedure than that utilized in

26  Taylor .  Instead of filling a "mixed" petition, petitioner filed a petition which contained two

27  exhausted claims for relief.  Petitioner went on to specifically request the Court to "hold this

28  petition in abeyance pursuant to petitioner's contemporaneously filed 'Application to Hold

United States District Court

For the Northern District of California

Federal Habeas Petition in Abeyance,'" to permit petitioner to present potentially dispositive claims to the state courts which had not yet been exhausted in state proceedings. Furthermore, petitioner provided notice in his original petition of the claims yet to be exhausted in state court and the operative facts giving rise to these claims.

On June 16, 2003, this Court granted the petitioner's application to hold his federal petition in abeyance while he litigated unexhausted claims in state court. The Court further order petitioner to file a status report every six months, beginning on December 1, 2003. On August 20, 2003, petitioner filed a Petition for Writ of Habeas Corpus with the California Supreme Court. On May 12, 2004, the California Supreme Court denied petitioner's pending Petition for Writ of Habeas Corpus. On June 1, 2004, petitioner filed an Amended Petition.

The instant petition thus raises the following narrow question: When a petitioner seeks to amend a pending habeas petition to add new claims which were factually described in his original petition and contemporaneously filed stay application (served and filed before the statute of limitations expired), do these new claims "relate back" to the earlier filed federal petition?

While this matter has been pending, the Supreme Court has issued two decisions which bear on this issue: Rhines v. Webber, 125 S.Ct. 1528 (2005) and Mayle v. Felix, 125 S. Ct. 2562 (20S05). In Rhines, the Supreme Court weighed in on the question of "whether a district court has the discretion to stay [a] mixed petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then return to federal court for review of his perfected petition." The Court answered this question in the affirmative, concluding that AEDPA does not deprive district courts of the authority to issue a stay and abeyance in the habeas context. Rhines at 1535. A district court's discretion to grant a stay, however, is circumscribed by AEDPA's stated purposes of reducing delay in the execution of criminal sentences and encouraging petitioners to seek relief in the state courts before filing their claims in federal court. Id. Because the use of a stay and abeyance procedure has the potential to undermine these dual purposes, its use is only appropriate where the district court has first determined that there was good cause for the petitioner's failure to exhaust the

claims in state court and that the claims are potentially meritorious.  Id.  Stays are also improper when the unexhausted claims are "plainly meritless" or where the petitioner has engaged in "abusive litigation tactics or intentional delay."  Id.  When these factors are absent, and the petitioner has good cause for the failure to exhaust, Rhines states "it likely would be an abuse of discretion for a district court to deny a stay."  Id.; see also Jackson at *17.

Rhines did not, however, comment on the validity of the three-step stay-and-abeyance procedure approved in Taylor, or the two-step procedure utilized in this case. Jackson at *18. These approaches are distinct.  Id.  Rhines "applies to stays of *mixed* petitions, whereas the three-step procedure applies to stays of *fully exhausted* petitions and requires additional steps – the amendment of the original mixed petition and a *second amendment* to add the newly exhausted claim."  Id.  It is a mater of first impression in the Ninth Circuit whether Rhines applies to the three-step stay-and-abeyance procedure approved of in Taylor or the two-step procedure employed by the petitioner here.  Id. ("we leave for another day the question of whether the stay standard announced by the Supreme Court in Rhines applies to our three-step stay-and-abeyance procedure").

Assuming, arguendo, that the Rhines standard applies to the two-step procedure at issue in the current case, the Court must revisit the question of whether it was within the Court's discretion to stay the original, completely exhausted petition while petitioner pursued his unexhausted claims in state court.[10]  Under Rhines, a stay and abeyance is only available limited circumstances and must be applied consistently with AEDPA: the claims petitioner seeks to pursue must be cognizable under § 2254 and there must be no evidence that the motion for a stay is brought to delay, to vex, or to harass, or that the request is an abuse of

_____

[10]The Ninth Circuit, sitting *en banc*, has made clear that the decision to grant a stay in order to avoid exceeding the limitations period is within the "discretion" of the district court. Valerio v. Crawford, 306 F.3d 742, 771 (9th Cir. 2002) (en banc).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

the writ.[11]   125 S. Ct. at 1535.  Moreover, where granting a stay, the district court must effectuate the timeliness concerns in AEDPA by placing "reasonable limits on a petitioner's trip to state court and back."  Id.

While this Court granted petitioner's application to hold his federal petition in abeyance without the benefit of the Supreme Court's specific analysis in Rhines, it does not appear that this Court abused its discretion by allowing petitioner to pursue litigation on his unexhausted claims in state court.  There is no evidence that the stay and abeyance motion was brought to delay the proceedings or that the request constituted abuse of the writ. And while this Court did not explicitly condition the stay on pursuit of state court remedies within a set time limit, it did require petitioner to file a status report every six months.  If it became apparent from these status reports that petitioner was engaging in dilatory tactics, the Court could (and certainly would) have taken appropriate measures to effectuate AEDPA's timeliness concerns.

Even assuming, however, that petitioner properly exhausted his Brady claim under Rhines, the Court must still determine whether this newly exhausted claim – contained in the First Amended Petition –  "relates back"to the filing of his original petition under Federal Rule of Civil Procedure 15(c).  It concludes that it does.

As a preliminary matter, it is well settled that habeas petitions may be amended or supplemented as provided for in the Federal Rules of Civil Procedure.  See Mayle, 125 S. Ct. at 2569; Rule 11 of the Rules Governing § 2254 Cases (when appropriate and consistent with Habeas Rules, Federal Rules of Civil Procedure apply in habeas corpus proceedings).  Nor does AEDPA bar the application of Federal Rule of Civil Procedure 15(c), governing relation

---

[11]"The doctrine of abuse of the writ defines the circumstances in which federal courts decline to entertain a claim presented for the first time in a second or subsequent petition for a writ of habeas corpus."  McClesky v. Zant, 499 U.S. 467, 470 (1991).  See also McKenzie v. Day, 57 F.3d 1461 (9th Cir.), aff'd en banc, 57 F.3d 1493 (9th Cir.), cert. denied, 514 U.S. 1104 (1995) (denying stay to petitioner who engaged in "abusive delay" by waiting until "eve of his execution" to raise claim that was available at time of previous habeas corpus petitions, "offered no reason for failing to raise claim earlier," and failed to present "strong showing of likelihood of success on the merits").

United States District Court

For the Northern District of California

1    back of amendments, to a petitioner's attempt to amend his petition to add newly exhausted

2    claims. <u>Id.</u>

3         As the Supreme Court has recently held, however, relation back will only be in order

4    if "the claims added by amendment arise from the same core facts of the timely filed claims,

5    and not when the new claims depend upon events separate in 'both time and type' from the

6    originally raised episodes." <u>Mayle</u>, 125 S. Ct. at 2571. "An amended habeas petition . . .

7    does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new

8    ground for relief supported by facts that differ in both time and type from those the original

9    pleading set forth." <u>Id.</u> at 2566. Only if the original and amended petition states claims that

10    are tied to a common core of operative facts will relation back be in order. <u>Id.</u> at 2574-75.

11         In this case, petitioner has satisfied the dictates of <u>Mayle</u> . When petitioner sought a

12    stay and abeyance, he gave both this Court and the state specific and timely notice of the

13    facts and legal theory he wanted to later include in his amended petition. These operative

14    facts were also included in his original petition. <u>See</u> Original Petition at 8. As such, both the

15    original petition and the amended petitions are "tied to a common core of operative facts."

16    <u>Mayle</u>, 125 S. Ct. 2574. Therefore, the amended petition "relates back" to the timely filed

17    original petition under <u>Mayle</u>, and petitioner's <u>Brady</u> claim is not barred by AEDPA's one-

18    year statute of limitations. <u>Id.</u>

19         In sum, given the particular facts of this case, the Court finds two-step procedure

20    utilized by petitioner was consistent with AEDPA's requirements and the general application

21    of Rule 15(c)(2) in habeas cases. <u>Id.</u> at 2575. Accordingly, the Court holds that petitioner's

22    <u>Brady</u> claim is timely and cognizable in this proceeding.[12]

23                   2. <u>Examination of the Merits of Petitioner's Brady Claim</u>

24

25        [12]As the Court has found that petitioner's <u>Brady</u> claim relates back under Federal Rule of Civil Procedure 15(c)(2), it is not necessary to address whether the change in the

26    application of Rule 15(c)(2) in this circuit while the petition was pending constitute "exceptional circumstances" sufficient to warrant equitable tolling of AEDPA's one-year

27    statute of limitations. <u>See</u> <u>Miles v. Prunty</u>, 187 F.3d 1104, 1107 (9th Cir. 1999) ("When external forces, rather than a petitioner's lack of diligence, account for the failure to file a

28    timely claim, equitable tolling of the statute of limitations may be appropriate").

United States District Court

For the Northern District of California

AEDPA cautions federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ.  Williams v. Taylor, 120 S. Ct. 1495, 1509 (2000); 28 U.S.C. § 2254(d)(1).  In this case, however, petitioner's Brady claim was not raised on direct appeal, and his state habeas petition was summarily denied without a written opinion..[13]  Without a state court opinion, it is more difficult to ascertain whether the state court correctly identified the governing legal principle or unreasonably applied clearly established federal law.  In such cases, the Ninth Circuit has held that a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. Only by that examination may we determine whether the state court's decision was objectively reasonable." (citation omitted)); accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).

To prevail on his Brady claim, petitioner must prove three elements: (1) that the evidence at issue was favorable to the accused (i.e. that it was exculpatory); (2) that evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression of the evidence prejudiced petitioner.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Benn v. Lambert, 283 F.3d 1040, 1052 (9th Cir. 2002).  Therefore, pursuant to the above authorities, this Court may only grant the writ if it determines from an independent view of the record that it would have been objectively unreasonable for the California courts to have

---

[13]The Ninth Circuit interprets the California Supreme Court's summary denial of review without citation of authority to be a decision on the merits. Harris v. Superior Court, 500 F.2d 1124, 1127-29 (9th Cir.1974) (en banc); see also Greene v. Lambert, 288 F.3d 1081, 1087 (9th Cir.2002).

concluded that petitioner had failed to meet at least one of these three elements.

### a.  Whether the Evidence was Favorable to the Accused

First, the Court must decide whether it would have been objectively reasonable for the California Supreme Court to conclude that no Brady violation occurred because the allegedly suppressed evidence was not favorable to the petitioner.  The independent review of the record leads the Court to find that such a conclusion would not be objectively reasonable because the suppressed evidence was undisputedly favorable to the petitioner.

Brady is not confined to evidence that affirmatively proves a defendant innocent: Even if evidence is merely "favorable to the accused," its suppression violates Brady.  See Brady v. Maryland, 373 U.S. 83, 87 (1963); Strickler v. Greene, 527 U.S. 263, 281-82 (1999). The evidence the prosecution failed to disclose here surely satisfies the low "favorable to the accused" standard.  Gantt v. Roe, 389 F.3d 908, 912 (9th Cir. 2004).  The state's theory was that two unknown men committed the crimes while petitioner stayed inside the truck.  The prosecutor theorized that petitioner was liable for murder and attempted murder because he had driven the truck knowing the crimes were going to occur.

Testimony that a long-haired individual who was possibly a women was driving the truck at or near the time the shootings would have directly contradicted the state's theory that the petitioner (who had short hair at the time) was the driver of the truck.  It follows that this testimony, if offered at trial, would have been favorable to petitioner, and it would have been objectively unreasonable for the California Supreme Court to conclude otherwise.

### b.  Whether the Evidence Was Suppressed by the State

Next the Court must decide whether it would have been objectively unreasonable for the California State Supreme Court to determine that the Brady violation did not occur because the evidence was not "suppressed" within the meaning of Brady.  Again, the Court concludes that the answer is yes because the evidence was plainly "suppressed" for purposes of the Brady doctrine.

To answer this question, the Court must first make a factual determination as to whether the identity of Witness 2 was "disclosed" to Mr. Rease by the State.  All the

evidence in the record points to the conclusion that it was not.  First,  Rease states in his second declaration that he thought Ms. Peguero was Witness Two and Olvis never specified to him that Witness Two was actually Mr. Sakasegawa.  Second, Mr. Sakasegawa states in his declaration that he was never contacted by the district attorney's officer or defense counsel at or prior to the time of the trial.  Finally, Olvis, for his part, does not recall whether he ever specified to Rease that Mr. Sakasegawa was the Witness 2 referenced in Officer Card's report.  In fact, the only time on record that Sakasegawa's name was disclosed to Rease was when Olvis provided Rease with a trial witness list in which Mr. Sakasegawa was listed as a potential witness.  Based on the above declarations, the only reasonable factual conclusion a court can make is that the identity of Witness 2 was never disclosed to Mr. Rease.

Having determined that the prosecutor failed to disclose the identity of Witness 2, the next step is to determine whether this undisclosed evidence was "suppressed" within the meaning of <u>Brady</u>.  The Ninth Circuit has held that <u>Brady</u> disclosures are the responsibility of the prosecutor and the failure of defense counsel to discover favorable evidence when it could or should have done so does not mean that such evidence has not been "suppressed" within the meaning of <u>Brady</u>.  <u>Gantt v. Roe</u>, 389 F.3d 908, 912..

California courts, however, follow a somewhat stricter rule.  In <u>People v. Morrison</u>, 34 Cal.4th 698 (2004), the California Supreme Court held that a defendant has no <u>Brady</u> claim when allegedly suppressed information was "fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the court was his lack of reasonable diligence."  <u>See</u> <u>also</u> <u>United States v. Cottage</u>, 307 F.3d 494, 500 (6th Cir. 2002); <u>Spears v. Mullin</u>, 343 F.3d 1215, 1256 (10th Cir. 2003) ("there can be no suppression by the state of evidence already known by and available to the defendant prior to trial"); <u>United States v. Brown</u>, 582 F.2d 197, 200 (2d Cir. 1978) ("where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a <u>Brady</u> violation by not bringing the evidence to the attention of the defense").

United States District Court

For the Northern District of California

1    Even under the California standard, however, it would be objectively unreasonable to

2   conclude that the evidence was not suppressed in this case.  According to the state, Mr. Rease

3   should have been aware that Ms. Peguero was not Witness Two because her interview

4   statements to the prosecutor to and Mr. Rease did not "jive" with Witness 2 statements to

5   Officer Card.  Even if it would be reasonable for a state court to take the position that defense

6   counsel should have somehow divined that Ms. Perguero was not Witness 2, this information

7   would have done nothing to tell defense counsel that Greg Sakasegawa **was** Witness 2.

8    Nor would it be objectively reasonable for the state court to conclude that the

9   prosecution's <u>Brady</u> obligation was satisfied when it disclosed Mr. Sakasegawa's name on

10  the state's witness list.  Of course, if Mr. Rease had interviewed every individual on the

11  state's witness list, he might have been able to obtain the undisclosed material. There was

12  nothing on the state's witness list, however, that would have led defense counsel to believe

13  that Greg Sakasegawa is Witness 2.  Burrying a witness's name in a trial witness list --

14  without concurrent disclosure that the witness has favorable information -- is gamesmanship

15  at its worst.  It would be an objectively unreasonable application of Supreme Court precedent

16  for a state court to conclude that such conduct satisfied the prosecutor's <u>Brady</u> obligations.

17  <u>See</u> <u>Benn v. Lambert</u>, 283 F.3d 1040, 1061-1062 (9th Cir. 2002) (providing defense counsel

18  with the name of a witness without telling him the witness has favorable information does

19  not satisfy <u>Brady</u>); <u>Singh v. Prunty</u>, 142 F.3d 1157, 1161-1163 (same); <u>Paradis v. Arave</u>, 130

20  F.3d 385 (9th Cir. 1997).

21   Moreover, in this case, the prosecutor's actions only served to mislead defense

22  counsel as to the significance of the witness.  <u>Benn v. Lambert</u>, 283 F.3d at 1062.  When

23  defense counsel asked for the identities of the two confidential witnesses who identified

24  Gonzales' truck at the scene of the shooting, the prosecutor did not respond that there were

25  actually three such witnesses.  Instead he provided the names of two of the witnesses while

26  withholding the name of another witness whose testimony was potentially damaging to the

27  prosecutor's case.  Later, when the prosecutor put Greg Sakasegawa on its witness list, it

28  never told defense counsel that Mr. Sakasegawa was Witness 2.  By first providing defense

**United States District Court**
For the Northern District of California

1   counsel with incomplete information as to the identity of Witness 2, and then placing Mr.

2   Sakasegawa on its own witness list as a witness against petitioner, the state affirmatively

3   mislead defense counsel as to the identity of Witness 2.[14]

4        In sum, based on its independent review of the record in this case, this Court readily

5   finds that identity of Witness 2 was "suppressed" within the meaning of <u>Brady</u>, and any state

6   court decision to the contrary would be an objectively unreasonable application of Supreme

7   Court precedent.

8

9

10                     c.  Whether the Evidence Was Material

11       Finally, the petitioner  must also show that he suffered prejudice. <u>Gantt v. Roe</u>, 389

12   F.3d 908, 913 (9th Cir. 2004).  Prejudice will be found if the suppressed evidence was

13   "material" under state law to the accused's guilt or punishment.  <u>Anderson v. Calderon</u>, 232

14   F.3d 1053, 1062, 1066 (9th Cir. 2000).  Evidence is material "if there is a reasonable

15   probability that, had the evidence been disclosed to the defense, the result of the proceeding

16   would have been different.  A 'reasonable probability' is a probability sufficient to undermine

17   confidence in the outcome."  <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985).[15]

18       Petitioner argues that the evidence was material to the state's theory of the case that

19   petitioner was the driver of the truck because Mr. Sakasegawa, an eyewitness with no

20   connection to the defendant, would have testified he had seen a long-haired female driving

21   the truck.  While this evidence would have been inconsistent with the state's theory, the state

22   court could have reasonably concluded that there was not a "reasonable probability" that the

23   result of the proceeding would have been different.

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25       [14]Whether the state mislead defense counsel as to Rease's identity intentionally or
     unintentionally is beside the point.  It is well settled law that <u>Brady</u> has no good faith or
26   inadvertence defense; whether nondisclosure was negligent or by design, it is the
     responsibility of the prosecutor.  <u>Gnatt v. Roe</u>, 389 F.3d 908, 912 (9th Cir), .<u>Kyles v.</u>
27   <u>Whitley</u>, 514 U.S. 419, 433.

28

United States District Court

For the Northern District of California

The testimony of a single witness – that he "believed [he] had seen long hair on the driver of the pickup" and was "left with the impression that the driver was female *though [he] could not be positive*" – would have been received against a backdrop of extensive evidence of guilt.  For example, it was undisputed that petitioner's truck was used in the shootings, petitioner was driving the truck shortly after the shootings, and the guns used in the shootings were found in his house.  His conduct at the time of the stop was suspicious, and he admitted not only to lying on multiple occasions to the police, but also to attempting to fabricate an alibi with a fellow gang member. There was also evidence that petitioner told his mother that he was the driver.

Against this wealth of circumstantial evidence, this Court cannot say it would have been objectively unreasonable for the California Supreme Court to conclude that, had Witness 2's identity been disclosed to the defense, it was not reasonably probable that the result of the proceeding would have been different.  It is important to note that the issue of whether a "reasonable probability" exists may not be based on mere speculation without adequate support.  See Wood v. Bartholomew, 516 U.S. 1, 6-8 (1995); see e.g., Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir. 200) (rejecting as speculative an argument that withheld material might have led to some admissible evidence which might have been sufficiently favorable to meet the Brady standard).

In sum, the California Supreme Court's implicit conclusion that the outcome of the case would be the same even if Mr. Sakasegawa's identity had been disclosed to the defense counsel is not objectively unreasonable.  Thus, although the prosecutor's actions in failing to disclose Mr. Sakasegawa's identity were clearly improper, the Court is not persuaded that the petitioner is entitled to relief habeas relief on this claim under AEDPA standards.[16]

---

[16]  The Court notes that, in its answer, the state disclosed for the first time, additional circumstantial evidence implicating petitioner's sister Elizabeth. Specifically, it disclosed that she had cuts on her hands after the shootings that were consistent with having 'racked' a semiautomatic handgun. According to Mr. Rease, "[i]f the state had disclosed this evidence . . .[he] would have presented this evidence at trial."  Second Rease Declaration.

A state court's determination of a constitutional claim may not be entitled to AEDPA deference under §2254(d)(1) when the claim is premised on Brady material that has surfaced for the first time during federal proceedings.  Monroe v. Angelone, 323 F.3d 286, 297 (4th

1

2   V.   CONCLUSION

3         For all of the reasons set forth above, this Court concludes that the state court's

4   adjudication of each of petitioner's constitutional claims did not result in a decision that was

5   contrary to, or involved an unreasonable application of, clearly established Federal law, as

6   determined by the Supreme Court of the United States.  Accordingly, and with good cause

7   appearing, the Court  DENIES petitioner's application for the writ.  The Clerk shall close the

8   file.

9

10   **IT IS SO ORDERED.**

11

12   DATED: Jan. 11, 2006                              _Thelton Henderson_
                                                        _____
13                                                      THELTON E. HENDERSON, JUDGE
                                                        UNITED STATES DISTRICT COURT
14

15

16

17

18

19

20   _____

21   Cir. 2003).  The Supreme Court has not decided this issue.  Holland v. Jackson, 542 U.S. 649
     (2004).  Assuming arguendo that it would be appropriate to evaluate petitioner's *Brady* claim
22   *de novo* with respect to this evidence, the Court is still unpersuaded that there is a reasonable
     probability that the result of the proceeding would have been different, even if this evidence
23   had been disclosed to the defense.  The fact that there is evidence consistent with Elizabeth
     racking a gun at some point that evening, does not negate petitioner's involvement. More
24   importantly, it is clear from petitioner's trial testimony that he knew the identities of the
     individuals involved in the shooting but he refused to name them.  Even if petitioner's sister
25   was the driver of the truck, then petitioner knew it all along, and consciously chose not to
     disclose this information to his attorney, Mr. Rease.  It therefore appears unlikely that
26   petitioner would have presented evidence directly inculpating any other individual, including
     his sister.  See MR 1.2, cmt. [2] (the lawyer has authority over "technical, legal, and tactical
27   matters," but the client has the right to make decisions about such matters as "the expense to
     be incurred and concern for third parties who might be adversely affected").

28

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28